**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

REX DUKE,                                       :
                                                :
      Plaintiff,                          :
                                                :
v.                                              :        CIVIL ACTION NO.
                                                :        1:13-CV-01663-RWS
BOBBY HAMIL, both                               :
individually and in his official               :
capacity as the Chief of Police of             :
Clayton State University, and the              :
BOARD OF REGENTS OF THE                         :
UNIVERSITY SYSTEM OF                            :
GEORGIA,                                        :
                                                :
      Defendants.                         :

## <u>ORDER</u>

      This case comes before the Court on Defendant Bobby Hamil's Motion
to Dismiss [11], Defendant Board of Regents of the University System of
Georgia's Motion to Dismiss [12], Defendant Bobby Hamil's Motion to
Dismiss Plaintiff's Amended Complaint [18], and Defendant Board of Regents
of the University System of Georgia's Motion to Dismiss Plaintiff's Amended
Complaint [19].  After reviewing the record, the Court enters the following
Order.

**Background**

This case arises out of Plaintiff's demotion following his posting of an image of the Confederate flag accompanied by the phrase, "It's time for the second revolution," on the social media website Facebook.  At the time of the November 2012 posting, Plaintiff Rex Duke was a police officer with over thirty years of experience.  (Compl., Dkt. [1] ¶ 7.)  In 2008 he achieved the rank of Captain and became the Deputy Chief of Police of the Clayton State University Police Department ("CSU Police Department" or "Department"), where had been employed since May 1, 2004.  (Id. ¶¶ 7-8.)  In his eight years at the Department, he received positive performance reviews, had no significant history of discipline, and even served as Interim Chief of Police for eleven months in 2007.  (Id. ¶¶ 9-10.)

On November 6, 2012, shortly after the conclusion of the 2012 presidential election, Plaintiff posted the aforementioned image and statement on his personal Facebook page.  (Id. ¶ 11.)  Plaintiff intended only those with direct access to his page, such as close friends and family, to view the post. (Id.)  He was not on duty at the time, and neither the post nor Plaintiff's Facebook profile referenced his employment at the CSU Police Department or

his job as a police officer.  (<u>Id.</u> ¶ 13.)  He expressed no grievances related to the

Department's policies or his colleagues; instead he claims that "the intention

behind the post was to express his general dissatisfaction with Washington

politicians."  (<u>Id.</u> ¶ 12.)  At the time, the Department had no social media policy

that would have prevented the post.  (<u>Id.</u> ¶ 15.)

Plaintiff took down the post within an hour, but during that period

someone provided an image of the post to Atlanta television station WSB.  (<u>Id.</u>

¶¶ 16-17.)  A reporter contacted Plaintiff and CSU officials, and the station

subsequently ran an evening news story discussing both the Facebook post and

Plaintiff's position as Deputy Chief the CSU Police Department.  (<u>Id.</u> ¶ 17.)

The Department received anonymous complaints against Plaintiff, prompting

CSU officials to commence an official investigation.  (<u>Id.</u> ¶ 18.)  In the ensuing

official report, Defendant Bobby Hamil, the Chief of Police of the CSU Police

Department, recommended Plaintiff's demotion and stated that the post "was

inappropriate for someone in [Plaintiff's] position[,] . . . [and] officers . . .

should not espouse political beliefs in public."  (<u>Id.</u> ¶¶ 20-22.)  Accordingly, on

January 7, 2013, Plaintiff was demoted from the rank of Captain to Detective

and was stripped of his duties as Deputy Chief, resulting in a $15,000 cut in

3

pay.  (Id. ¶ 20.)  Finally, on April 22, 2013, Defendant Hamil reassigned

Plaintiff from his day-shift patrol duties to the less desirable morning shift,

which is typically assigned to less experienced officers, "in contravention of

well-established customs and practices that seniority is a major factor in

determining shift assignments."  (Id. ¶ 25.)

On May 16, 2013, Plaintiff filed this action against Defendant Hamil in

his official and individual capacities and against the Board of Regents of the

University System of Georgia ("Board of Regents"), the state entity that

operates CSU and other public universities in Georgia, alleging that they

demoted Plaintiff in violation of the First Amendment as a means "to punish

[him] for privately advocating for his personal political beliefs, and sought to

restrain his ability to privately advocate for those personal beliefs."  (Id. ¶ 28.)

Plaintiff states that his speech caused no disruption to the CSU Police

Department's law enforcement purposes or the educational purposes of CSU as

a whole.  (Id. ¶ 29.)  Furthermore, Plaintiff alleges that Defendants' actions

have had "a chilling effect upon expression in general" at the Department.  (Id.

¶ 30.)  As a result of his demotion and reassignment, Plaintiff experienced

significant emotional distress and financial hardship, which in turn impacted his health by exacerbating a pre-existing heart condition.  (Id. ¶ 26.)

Plaintiff later filed an Amended Complaint [14] stating that he seeks relief against Hamil pursuant to both 42 U.S.C. § 1983 and the doctrine of Ex parte Young.  (Am. Compl., Dkt. [14] ¶ 33.)  Plaintiff also alleged for the first time that Defendants were liable for his ultimate termination, but Plaintiff subsequently clarified that he voluntarily resigned from the CSU Police Department after filing this action, and that the use of the word "termination" in the Amended Complaint [14] was a scrivener's error.  (Pl.'s Br. in Opp'n, Dkt. [20] at 3-4.)  Thus, the only allegations of retaliation in this case pertain to Plaintiff's demotion and reassignment.

Finally, Plaintiff seeks a declaratory judgment stating that his First Amendment rights were violated; an injunction reinstating him to his prior rank, title, and pay grade; an injunction barring infringement of Plaintiff's or other employees' First Amendment rights; an injunction requiring Defendants to implement new First Amendment policies and to provide training to all Board of Regents employees; and compensatory and punitive damages.

Defendants Hamil and Board of Regents each filed motions to dismiss on June 20, 2013, and July 3, 2013, respectively, and again filed motions to dismiss on July 29, 2013, after Plaintiff filed his Amended Complaint [14].

## Discussion

As a preliminary matter, in light of Plaintiff's Amended Complaint [14], Defendant Hamil's Motion to Dismiss [11] and Defendant Board of Regents' Motion to Dismiss [12] are **DENIED as moot**.  However, the Court considers arguments from Defendants' earlier motions that pertain to the motions to dismiss the Amended Complaint [14].

## I.    Motion to Dismiss Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  While this pleading standard does not require "detailed factual allegations," "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  In order to withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

6

Id. (quoting Twombly, 550 U.S. at 570).  A complaint is plausible on its face

when the plaintiff pleads factual content necessary for the court to draw the

reasonable inference that the defendant is liable for the conduct alleged.  Id.

At the motion to dismiss stage, "all-well pleaded facts are accepted as

true, and the reasonable inferences therefrom are construed in the light most

favorable to the plaintiff."  Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1273

n.1 (11th Cir. 1999).  However, the same does not apply to legal conclusions set

forth in the complaint.  Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260

(11th Cir. 2009) (citing Iqbal, 556 U.S. at 678).  "Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not

suffice."  Iqbal, 556 U.S. at 678.  Furthermore, the court does not "accept as

true a legal conclusion couched as a factual allegation."  Twombly, 550 U.S. at

555.

## II. Board of Regents of the University System of Georgia's Motion to Dismiss

Plaintiff alleges that under 42 U.S.C. § 1983, "the Board [of Regents] is

liable for Hamil's official conduct as a final policymaker for the Board with

respect to the employment practices of the CSU Police Department and the

AO 72A
(Rev.8/82)

employment and ultimate [demotion] of Duke."  (Compl., Dkt. [14] ¶ 33.)  "In order to prevail in a civil rights action under section 1983, 'a plaintiff must make a prima facie showing of two elements: (1) that the act or omission deprived plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States, and (2) that the act or omission was done by a person acting under color of law.' "  Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist., 992 F.2d 1171, 1174 (11th Cir. 1993) (quoting Bannum, Inc. v. City of Ft. Lauderdale, 901 F.2d 989, 996-97 (11th Cir. 1990)).  In this regard, the U.S. Supreme Court has held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983."  Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989).  On the contrary, states and their officials are immune from suit under § 1983 pursuant to the Eleventh Amendment, which, absent congressional abrogation,[1] "protects a State from being sued in federal court without the State's consent."  Manders v. Lee, 338 F.3d 1304, 1308 (11th Cir. 2003).  As a state institution, the Board of Regents is

---

[1] Congress did not abrogate Eleventh Amendment immunity for claims brought pursuant to § 1983.  Quern v. Jordan , 440 U.S. 332, 338 (1979).

therefore immune from suit.[2]  Consequently, Defendant Board of Regent's

Motion to Dismiss [19] is **GRANTED**.

### III.     Bobby Hamil's Motion to Dismiss

Plaintiff brings his § 1983 claim against Defendant Hamil in both his

official and individual capacities.  He also seeks prospective relief from Hamil

in his official capacity under Ex parte Young.

A.     Official-Capacity Claim and Sovereign Immunity

Under 42 U.S.C. § 1983,

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or the
> District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other proper
> proceeding for redress . . . .

_____

[2] Plaintiff does not dispute that the Board of Regents is an arm of the state, but he does contend that the Board of Regents should remain a defendant if Hamil is found liable in his official capacity under Ex parte Young.  As discussed more fully in Part III.A, *infra*, Plaintiff's Ex parte Young claim against Hamil fails.  Moreover, holding an official liable for prospective relief under Ex parte Young does not justify retaining the state as a defendant.  See P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 146 (1993) (stating that Ex parte Young "has no application in suits against the States and their agencies, which are barred regardless of the relief sought" (citing Cory v. White, 457 U.S. 85, 91 (1982))); Grizzle v. Kemp, 634 F.3d 1314, 1319 (11th Cir. 2001) (explaining that a suit against a state official in his official capacity pursuant to Ex parte Young is not considered a suit against the state).

As stated above, "[i]n order to prevail in a civil rights action under section 1983, 'a plaintiff must make a prima facie showing of two elements: (1) that the act or omission deprived plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States, and (2) that the act or omission was done by a person acting under color of law.'" Marshall Cnty. Bd. of Educ., 992 F.2d at 1174 (quoting Bannum, Inc., 901 F.2d at 996-97).

Official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." Monell v. Dep't of Social Servs., 436 U.S. 658, 690 n.55 (1978). Thus, suits against government officials in their official capacities should be treated as suits against the government. Kentucky v. Graham, 473 U.S. 159, 166 n.11 (1985). In this case, Plaintiff's official-capacity claim against Defendant Hamil as Chief of the CSU Police Department is in reality a claim against the Board of Regents, his employer. For the reasons discussed in Part II, *supra*, the Board of Regents is immune under the Eleventh Amendment as an agency of the State of Georgia.

10

Nevertheless, Plaintiff argues that he is entitled to prospective injunctive relief against Hamil as a state official.[3]  Pursuant to Ex parte Young, "a suit alleging a violation of the federal constitution against a state official in his official capacity for injunctive relief on a prospective basis is not a suit against the state, and, accordingly, does not violate the Eleventh Amendment."  Grizzle v. Kemp, 634 F.3d 1314, 1319 (11th Cir. 2011).  "[This] doctrine applies only to ongoing and continuous violations of federal law."  Summit Med. Assocs., P.C. v. Pryor, 180 F.3d 1326, 1337 (11th Cir. 1999); see also Papasan v. Allain, 478 U.S. 265, 277-78 (1986) ("Young has been focused on cases in which a violation of federal law by a state official is ongoing as opposed to cases in which federal law has been violated at one time or over a period of time in the past, as well as on cases in which the relief against the state official directly ends the violation of federal law as opposed to cases in which that relief is intended indirectly to encourage compliance with federal law through

---

[3] While Plaintiff's Amended Complaint broadly states that "Defendant Hamil is liable, both personally and in his official capacity under Section 1983 and pursuant to the doctrine of Ex Parte Young," (Dkt. [14] ¶ 33), Plaintiff has since clarified that his claim against Defendant Hamil in his official capacity is limited to prospective relief only.  (See Pl.'s Br. in Opp'n, Dkt. [20] at 8 ("To the extent Plaintiff is seeking any non-prospective injunctive relief, he seeks that relief against Hamil in his personal, not official capacity.")).

deterrence . . . .").  However, Ex parte Young does not apply in two situations:
"(1) it cannot be used to compel an executive official to undertake a
discretionary task; and (2) it cannot be used if the suit is, in reality, against the
state."  Seminole Tribe of Fla. v. Florida, 11 F.3d 1016, 1028 (11th Cir. 1994).
As the Supreme Court has instructed, to determine if the Ex parte Young
exception applies, "a court need only conduct a straightforward inquiry into
whether [the] complaint alleges an ongoing violation of federal law and seeks
relief properly characterized as prospective."  Verizon Md., Inc. v. Pub. Serv.
Comm'n of Md., 535 U.S. 635, 645 (2002) (internal quotation marks omitted).

According to Plaintiff, "the injunctive relief sought . . . merely seeks to
compel Hamil, as the head of the CSU Police Department, to respect the First
Amendment Rights of his employees."  (Pl.'s Br. in Opp'n, Dkt. [20] at 5.)
Specifically, in his Amended Complaint [14], Plaintiff asks the Court to do the
following:

> c)    Issue a mandatory, preliminary and permanent injunction
>       barring Defendants from continuing to take actions that
>       infringe upon the First Amendment rights of [Plaintiff] or
>       any other employee;
>
> d)    Issue a mandatory, preliminary and permanent injunction
>       requiring Defendants to implement a rigorous policy

> protecting employees' First Amendment rights and to
> provide meaningful training to all employees of the Board of
> Regents of the University System of Georgia regarding
> employees' rights to freedom of expression and freedom of
> speech, as well as ways to avoid First Amendment violations
> and retaliation . . . ."

(Am. Compl., Dkt. [14] at 3.)  Thus, Plaintiff's requested relief is aimed at both

redressing the alleged ongoing violation of Plaintiff's rights and preventing

future violations of other employees' First Amendment rights.  Both sets of

relief are prospective, and putting aside the underlying constitutional question,

the Court examines each to determine if the alleged constitutional deprivation it

redresses is ongoing.

### 1.    Relief Redressing Plaintiff's Rights

Assuming, without deciding, that Plaintiff's demotion was a violation of

his First Amendment rights, the Court finds that the violation is not ongoing

because Plaintiff has since resigned.  Plaintiff does not allege that he was

terminated in retaliation for his speech, and "employee resignations are

presumed to be voluntary" absent evidence that the employee was unable "to

exercise free choice."  Hargray v. City of Hallandale, 57 F.3d 1560, 1568 (11th

Cir. 1995).  Plaintiff has made no allegations that his resignation was forced or

coerced.  Therefore, there is no continuing constitutional violation based on his

demotion because he has voluntarily terminated his employment.

### 2.     Relief Aimed at Protecting All Employees

Plaintiff also contends that there is an ongoing constitutional violation

against all employees because "the official actions of Hamil, on behalf of CSU

as the head of the CSU Police Department, reflect a willingness to punish

employees for the exercise of their rights under the First Amendment."  (Pl.'s

Br. in Opp'n, Dkt. [20] at 7.)  Other than alleging that "Defendants' actions . . .

have a chilling effect upon expression in general," (Compl., Dkt. [1] ¶ 30),

Plaintiff alleges no specific facts to show that Defendant Hamil has been

suppressing the speech of his employees.  Simply alleging that Plaintiff's

demotion has chilled others' First Amendment rights fails to show a plausible

constitutional violation, let alone one that is ongoing, and thus Ex parte Young

is inapplicable.  Consequently, Plaintiff's official-capacity claim fails.

### B.     Individual-Capacity Claim and Qualified Immunity

Next, the doctrine of qualified immunity protects government officials

performing discretionary functions from being sued in their individual

capacities.  Wilson v. Layne, 526 U.S. 603, 609 (1999).  Officials are shielded

"insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  "To receive qualified immunity, a government official first must prove that he was acting within his discretionary authority." Cottone v. Jenne, 326 F.3d 1352, 1357 (11th Cir. 2003).  Once the government official has satisfied this initial burden, the burden shifts to the plaintiff to show that the official is not entitled to qualified immunity.  Id. at 1358.

As a preliminary matter, Defendant Hamil was acting in his discretionary authority as Chief of Police of the CSU Police Department.  A government employee acts in his discretionary authority when "(a) performing a legitimate job-related function . . . (b) through means that were within his power to utilize." Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004).  Demoting and assigning Department employees to shifts are legitimate functions of running a police force and are well within the Chief of Police's power.

Next, whether an official is entitled to qualified immunity is determined by a two-step inquiry.  One inquiry is "whether the plaintiff's allegations, if

true, establish a constitutional violation." Barnett v. City of Florence, 409 F.

App'x 266, 270 (11th Cir. 2010) (citing Hope v. Pelzer, 536 U.S. 730, 736

(2002)).  "If the facts, construed . . . in the light most favorable to the plaintiff,

show that a constitutional right has been violated, another inquiry is whether the

right violated was 'clearly established.' " Id. (citing Saucier v. Katz, 533 U.S.

194, 201 (2001)).  "Both elements of this test must be present for an official to

lose qualified immunity, and this two-pronged analysis may be done in

whatever order is deemed most appropriate for the case." Id. (citing Pearson v.

Callahan, 555 U.S. 223, 241 (2009)).  The Court first examines the substantive

constitutional question.

### 1.     First Amendment Retaliation

To state a claim for retaliation in violation of the First Amendment,

Plaintiff, as a government employee, must show that his speech was

constitutionally protected and that the speech was a substantial or motivating

factor in Defendant's decision to demote him. Boyce v. Andrew, 510 F.3d

1333, 1343 n.12 (11th Cir. 2007).  Whether Plaintiff has made this showing is

governed by the four-part Pickering[4] analysis, under which the Court must find

---

[4] Pickering v. Bd. of Educ., 391 U.S. 563 (1968).

16

that (1) Plaintiff's speech involved a matter of public concern; (2) Plaintiff's interest in speaking outweighed the government's legitimate interest in efficient public service; and (3) the speech played a substantial part in the government's challenged employment decision.  Cook v. Gwinnett Cnty. Sch. Dist., 414 F.3d 1313, 1318 (11th Cir. 2005) (citing Bryson v. Waycross, 888 F.2d 1562, 1565-66 (11th Cir. 1989)).  If the employee can make the above showing, the burden shifts to the government to show that (4) it would have made the same employment decision even in the absence of the protected speech.  Id.  The first two prongs of this test are questions of law while the latter two are questions of fact.  Id.  In light of the Court's conclusions presented below, only the first two prongs of this test must be considered.

      a.     *Did Plaintiff speak as a citizen on a matter of public concern?*

The government as employer has a stronger interest in regulating the speech of its employees than in regulating the speech of the citizenry in general.  Connick v. Myers, 461 U.S. 138, 140 (1983).  Nonetheless, it is well-settled that "[a] public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment."

17

Id.  Accordingly, the First Amendment protects government employee speech if the employee speaks "as a citizen upon matters of public concern." Id. at 147. If, on the other hand, the employee speaks "as an employee upon matters only of personal interest," the speech is not entitled to constitutional protection. Id. As part of this analysis, the Court must decide both (1) if Plaintiff spoke as a citizen, and (2) whether his speech was a matter of public concern. See Boyce, 510 F.3d at 1342.

For the first inquiry, a court must examine "whether a government employee's speech relates to his or her job as opposed to an issue of public concern." Boyce, 510 F.3d at 1343. "The 'controlling factor' is whether the expressions are made as an employee fulfilling his responsibility to his employer." Springer v. City of Atlanta, No. 1:05-CV-0713-GET, 2006 WL 2246188 at *3 (N.D. Ga. Aug. 4, 2006) (citing Garcetti v. Ceballos, 547 U.S. 410, 421 (2006)).  Here, Plaintiff posted the image and statement on his personal Facebook page, which did not identify his employment with the CSU Police Department.  Nor did the statement refer to any of the Department's policies, practices, or employees.  There is thus no indication that Plaintiff spoke pursuant to his official duties in any way.  As a result, the Court

18

concludes that Plaintiff spoke as a citizen, not as an employee of the CSU

Police Department.

Second, the Court decides if the speech was in fact a matter of public

concern based on "the content, form, and context of the employee's speech."

Bryson, 888 F.2d at 1565.  In Connick v. Myers, the U.S. Supreme Court

characterized a matter of public concern as that "upon which 'free and open

debate is vital to informed decision-making by the electorate.' "  461 U.S. at

145 (quoting Pickering, 391 U.S. at 571-72).  Speech involves a matter of

public concern when it can be "fairly considered as relating to any matter of

political, social, or other concern to the community."  Id. at 146.  Defendant

argues that the phrase " 'It's time for the second revolution' is not itself a matter

of 'legitimate' public concern."  (Hamil's Br. in Supp. of His Mot. to Dismiss,

Dkt. [11-1] at 7).  However, the Court finds that Plaintiff's speech can be fairly

considered to relate to matters of political concern to the community because a

Confederate flag can communicate an array of messages, among them various

political or historical points of view.  Combine this symbol with a statement

calling for a revolution right after an election, and it is plausible that Plaintiff

was expressing his dissatisfaction with Washington politicians.  Even if

19

Plaintiff had intended to convey a more radical message by using the Confederate flag and the word *revolution*, that message would also relate to political and social concerns of the community regardless of how unpopular or controversial that point of view may be.  Plaintiff's speech was thus a matter of public concern because it expressed disapproval of elected officials, certainly a topic "upon which 'free and open debate is vital to informed decision-making by the electorate.' "  Connick, 461 U.S. at 145 (quoting Pickering, 391 U.S. at 571-72).  In that regard, the First Amendment protects his speech unless the government's countervailing interests outweigh his interest in speaking.

> b.   *Did Plaintiff's interest in speaking outweigh the CSU Police Department's countervailing interests?*

Under the second prong of the Pickering analysis, the Court must weigh Plaintiff's First Amendment interests against the interest of the CSU Police Department, "as an employer, in promoting the efficiency of the public services it performs through its employees."  391 U.S. at 568.  This balancing test reflects the fact that government employers must be given "wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment," Connick, 461 U.S. at 146, and must be permitted to

20

"take action against employees who engage in speech that 'may unreasonably disrupt the efficient conduct of government operations.' " <u>Reid v. City of Atlanta</u>, No. 1:08-CV-1846-JOF, 2010 WL 1138456 at *9 (N.D. Ga. Mar. 22, 2010) (quoting <u>Tindal v. Montgomery County Comm'n</u>, 32 F.3d 1535, 1540 (11th Cir. 1994)).  The government's interest in efficient public service is particularly acute in the context of police departments, which "have more specialized concerns than a normal government office."  <u>Id.</u>  Indeed, the Supreme Court has recognized the "need for discipline[,] esprit de corps, and uniformity" within the police force.  <u>Kelley v. Johnson</u> 425 U.S. 238, 246 (1976).  The Eleventh Circuit has likewise recognized the unique needs of police departments, noting, "Order and morale are critical to successful police work: a police department is a 'paramilitary organization, with a need to secure discipline, mutual respect, trust and particular efficiency among the ranks due to its status as a quasi-military entity different from other public employers.' " <u>Hansen v. Soldenwagner</u>, 19 F.3d 573, 577 (11th Cir. 1994) (quoting <u>Bryson v. City of Waycross</u>, No. CV588-017, 1988 WL 428478 at *9 (S.D. Ga. Nov. 1, 1988), <u>aff'd</u>, 888 F.2d 1562 (11th Cir. 1989)).  Moreover, police departments

21

have a particular interest in maintaining "a favorable reputation with the public." Busby v. City of Orlando, 931 F.2d 764, 775 (11th Cir. 1991).

Several factors must be considered in determining whether the government's legitimate interest in efficient public service outweighs the government employee's interest in protected freedom of speech. Specifically, courts must assess "(1) whether the *speech at issue* impedes the government's ability to perform its duties efficiently, (2) the manner, time and place of the speech, and (3) the context within which the speech was made." Martinez v. City of Opa-Locka, 971 F.2d 708, 712 (11th Cir. 1992) (quoting Bryson, 888 F.2d at 1567) (internal quotation marks omitted).

Plaintiff alleges that "Duke's advocacy did not cause any disruption to the law enforcement purposes of the Clayton State University Police Department, nor the educational purposes of Clayton State University in general." (Compl., Dkt. [1] ¶ 29.) Even so, Defendant Hamil had an interest in preventing the speech from impeding the Department's functions. As the Supreme Court stated in Connick,

> When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate. Furthermore, we do not see the necessity

22

> for an employer to allow events to unfold to the extent that the
> disruption of the office and the destruction of working
> relationships is manifest before taking action.

461 U.S. at 151-52.

After all, while the Court acknowledges that Plaintiff intended to express his disapproval of Washington politicians, on its face his speech could convey a drastically different message with different implications.  Many of these messages are controversial, divisive, and prejudicial to say the least.  Because these potentially offensive messages came from the Department's second-in-command, Hamil did not have to wait to see if the controversy affected the discipline, mutual respect, or trust among the officers Plaintiff supervised before addressing it.  See Gresham v. City of Atlanta, No. 1:10-CV-1301-RWS, 2011 WL 4601020 (N.D. Ga. Sept. 30, 2011) ("[T]he fact that Defendants have not come forward with specific evidence of workplace disruption is not fatal to their argument.").  Given Plaintiff's supervisory responsibilities, such speech could undermine "loyalty, discipline, [and] good working relationships among the [Department's] employees" if left unaddressed.  Busby, 931 F.2d at 774.

In addition to possible internal disruption, the public attention the speech received also implicated the Department's reputation and the public's trust.

Plaintiff argues that "there is nothing in the record to even suggest that Plaintiff's post threatened the CSU police department's reputation."  (Pl.'s Br. in Opp'n, Dkt. [13] at 20.)  Plaintiff asserts that it is conjecture to infer Plaintiff's speech threatened an impact on reputation because it "ask[s] the Court to 'assume' some damage to reputation arose from the speech."  (Id.)  But a genuine potential for speech to harm a police department's reputation also justifies an employer taking action before that harm is realized.  See Connick, 461 U.S. at 151-52.  And here the potential is more than conjecture.  Because Plaintiff was the Deputy Chief of Police, his conduct reflected on the Department's reputation more significantly than the conduct of other officers. It is also plain that many in the community would take offense to his chosen form of speech, not just because they disapprove of it, but because it raises concerns of Plaintiff's prejudice—and the Department's.  Appearing to advocate revolution, coming from a police officer charged with upholding law and order, could also undermine confidence in the Department.  In sum, the speech at issue was capable of impeding the government's ability to perform its duties efficiently.

24

Next, the Court considers the time, place, and manner of Plaintiff's Facebook post.  At the time he made the post, Plaintiff was off duty and off campus, thus heightening Plaintiff's First Amendment interest.  Plaintiff states that the place of speech also favors him because his post "was not widely disseminated, but simply posted to his private Facebook account."  (Pl.'s Br. in Opp'n, Dkt. [13] at 20.)  Indeed, he intended the post "to be viewed only by close friends and family that had access to his Facebook page."  (Compl., Dkt. [1] ¶ 11.)  Yet despite his intentions and his quick removal of it, the post became public after someone provided the image to a television station.  This illustrates the very gamble individuals take in posting content on the Internet and the frequent lack of control one has over its further dissemination.  And even though there was no social media policy prohibiting political posts on websites like Facebook, the absence of such a policy did not foreclose a response to speech that compromised the Department's interests.

Plaintiff further states that the manner of the speech was not violent, threatening, obscene, or in any way directed at the CSU Police Department.  (Pl.'s Br. in Opp'n, Dkt. [13] at 21.)  The use of a symbol open to so many controversial interpretations, however, was likely offensive to some members of

the public.  Plaintiff's intent may not have been to convey an offensive

message, but his chosen manner of speech left ample room for interpretation.

Finally, the Court examines the context of Plaintiff's speech.  The Court

recognizes Plaintiff's interest in expressing his political views, especially

during an election season.  Indeed, political speech "is the essence of self-

government," and it "occupies the highest rung of the hierarchy of First

Amendment values, and is entitled to special protection."  Connick, 461 U.S. at

145.  But the politically charged context also heightens the potential for

Plaintiff's particular speech to damage the Department's interests.  Appearing

to advocate revolution during a presidential election, and to associate that idea

with a Confederate flag, Plaintiff likely sent a partisan, if not prejudicial,

message to many in the CSU Police Department and the community it serves.

After carefully weighing these factors, the Court finds that the CSU

Police Department's interests outweigh Plaintiff's interest in speaking.  It is

obvious that speech invoking revolution and the Confederate flag could convey

a host of opinions that many would find offensive, especially when associated

with a senior law enforcement official.  Despite Plaintiff's intention to limit

who saw his off-duty speech, his choice to place it on a social media platform

26

risked sharing it with a much broader audience.  Further, even though it is

critical to safeguard political speech, the context of making this particular post

around an election also risked dividing the Department's ranks and the CSU

community.  Thus, Defendant Hamil did not violate the First Amendment when

he demoted Plaintiff to maintain both the CSU Police Department's good

working relationships and its reputation.

### 2.    Did Defendant Hamil Violate a Clearly Established Constitutional Right?

Even if the Court concluded that Hamil did violate Plaintiff's First

Amendment rights, Hamil would still be entitled to qualified immunity because

that right was not clearly established.  A constitutional right is clearly

established "only if its contours are 'sufficiently clear that a reasonable official

would understand what he is doing violates that right.' "  Vaughan v. Cox, 316

F.3d 1210, 1212 (11th Cir. 2003) (quoting Anderson v. Creighton, 483 U.S.

635, 640 (1987)).  While the fact patterns of prior cases used to show that a

right is clearly established need not be "fundamentally similar" or even

"materially similar," the salient question is whether the law at the time of the

alleged violation gave officials "fair warning" that their acts were

AO 72A
(Rev.8/82)

unconstitutional.  Holmes v. Kucynda, 321 F.3d 1069, 1078 (11th Cir. 2003)

(quoting Hope, 536 U.S. at 740).

In Busby v. City of Orlando, the Eleventh Circuit addressed the issue of

qualified immunity in a case involving a police officer's First Amendment

rights.  The Court held:

> The Supreme Court has never established a bright-line test
> for determining when a public employee may be disciplined in
> response to that employee's speech.  Instead, Pickering established
> a case-by-case balancing of interests test. . . .  Because no bright-
> line standard exists to put the employer on notice of a
> constitutional violation, this circuit has recognized that a public
> employer is entitled to immunity from suit unless the Pickering
> balance "would lead to the inevitable conclusion that the discharge
> of the employee was unlawful."

Busby, 931 F.2d at 773-74 (citation omitted) (quoting Connick, 461 U.S. at

142).  The Court found that it did not have to decide the precise result of

applying the Pickering test, but had to "only decide whether such a result would

be so evidently in favor of protecting the employee's right to speak that

reasonable officials in appellees' place would necessarily know that the

termination of [Busby] under these circumstances violated [Busby's]

constitutional rights."  Id. at 774 (internal quotation marks omitted).

28

In the present case, the Court has found that the balance of interests favors the government.  But even if Plaintiff did suffer a constitutional violation, in light of police departments' heightened interests in providing efficient public service, the outcome does not so evidently favor Plaintiff such that Defendant Hamil was expected to know that demoting him would result in a constitutional violation.  Therefore, the Court concludes that Plaintiff's right to speak as he did in this instance was not clearly established.  As such, Defendant Hamil is entitled to qualified immunity, and accordingly his Motion to Dismiss Plaintiff's Amended Complaint [18] is **GRANTED**.

## Conclusion

For the foregoing reasons, Defendant Hamil's Motion to Dismiss [11] and Defendant Board of Regents of the University System of Georgia's Motion to Dismiss [12] are **DENIED as moot**.  Defendant Hamil's Motion to Dismiss Plaintiff's Amended Complaint [18] and Defendant Board of Regents of the University System of Georgia's Motion to Dismiss Plaintiff's Amended Complaint [19] are **GRANTED**.

AO 72A
(Rev.8/82)

**SO ORDERED**, this  4th   day of February, 2014.


RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

30

AO 72A
(Rev.8/82)